820 So.2d 494 (2002)
CASINO ASSOCIATION OF LOUISIANA & Individual Members
v.
STATE of Louisiana, Through the Honorable Murphy J. FOSTER, Governor, The Honorable Richard P. Ieyoub, Attorney General.
No. 2002-CA-0265.
Supreme Court of Louisiana.
June 21, 2002.
*495 R. Gray Sexton, L. Rand Dennis, Richard P. Ieyoub, Attorney General, Maris L. McCrory, Baton Rouge, Counsel for Applicant.
Juston M. O'Brien, Paul S. West, McGlinchey, Stafford, Baton Rouge, Richard C. Stanley, Donald H. Knecht, Jr., Thomas M. Flanagan, Stanley & Flanagan, New Orleans, Dean A. Cole, Cliffe E. Laborde, III, Laborde & Neuner, Lafayette, Counsel for Respondent.
VICTORY, J.
This case is before us on direct appeal of a finding by the district court that the statutes prohibiting campaign contributions from the riverboat and land-based casino industries are unconstitutional. After reviewing the record and the applicable law, we reverse the judgment of the district court and uphold the constitutionality of these statutes.

FACTS AND PROCEDURAL HISTORY
On September 20, 2000, the Casino Association *496 of Louisiana ("CAL")[1] and its individual members filed a Petition for Declaratory Judgment in the 19th Judicial District Court alleging that the provisions of La. R.S. 18:1505.2(L) prohibiting campaign contributions by the riverboat and land-based casino industries are unconstitutional. Treasure Chest Casino, LLC ("TCC")[2] and two Harrah's entities, Harrah's Operating Company, Inc. and Harrah's Entertainment, Inc. (jointly "Harrah's")[3], were permitted to intervene in the lawsuit in light of their respective interests in the laws that regulate the casino gaming industry.
Harrah's, TCC, CAL and its individual members are prohibited from making campaign contributions to candidates or to political committees of candidates by operation of La. R.S. 18:1505.2(L), which provides in pertinent part as follows:
L. (1) The legislature recognizes that it is essential to the operation of effective democratic government in this state that citizens have confidence in the electoral process and that elections be conducted so as to prevent influence and the appearance of influence of candidates for public office and of the election process by special interests, particularly by persons substantially interested in the gaming industry in this state.
(2) No person to whom this Subsection is applicable as provided in Paragraph (3) of this Subsection shall make a contribution, loan, or transfer of funds, including but not limited to any in-kind contribution, as defined in this Chapter, to any candidate, any political committee of any such candidate, or to any other political committee which supports or opposes any candidate.
(3) This Subsection shall be applicable to all of the following:
. . .
(a)(ii) Any person who holds a license to conduct gaming activities on a riverboat, who holds a license or permit as a distributor or supplier of gaming devices or gaming equipment including slot machines, or who holds a license or permit as a manufacturer of gaming devices or gaming equipment including slot machines issued pursuant to the Louisiana Riverboat Economic Development and Gaming Control Act [La. R.S. 27:41 et seq.], and any person who owns a riverboat upon which gaming activities are licensed to be conducted.
(iii) Any person who holds a license or entered into a contract for the conduct of casino gaming operations, who holds a license or permit as a distributor of gaming devices or gaming equipment including slot machines, or who holds a license or permit as a manufacturer of gaming devices or gaming equipment including slot machines issued pursuant to the Louisiana Economic Development and Gaming Corporation Act [La. R.S. 27:201 et seq.], and any person who owns a casino where such gaming operations are licensed.
. . .

*497 (b)(i) Any person who has an interest, directly or indirectly, in any legal entity included in Subparagraph (a) of this Paragraph. "Interest," as defined in this Subparagraph, means ownership by an individual or spouse, either individually or collectively, of an interest which exceeds ten percent of any legal entity. An indirect interest is ownership through any number of layers of legal entities when twenty-five percent or more or each legal entity is owned by the legal entity ownership beneath it.
(ii) Any holding, intermediary, or subsidiary company of any person included in Subparagraph (a) of this Paragraph and any officer, director, trustee, or partner thereof.
(c) Any officer, director, trustee, partner, or senior management level employee or key employee as defined in R.S. 27:205(19) of any person included in Subparagraph (a) or (b) of this Paragraph.
. . .
(e) The spouse of any person to whom this Subsection is made applicable by this Paragraph.
Following a hearing, the district court, Judge Timothy Kelley presiding, declared La. R.S. 18:1505.2(L)(3)(a)(ii) and La. R.S. 18:1505.2(L)(3)(b)(c)(e), insofar as they are applicable to La. R.S. 18:1505.2(L)(3)(a)(ii) and (iii), unconstitutional. The court also declared unconstitutional a corresponding provision of the Louisiana Administrative Code, 42 LA-ADC Pt. IX, § 2941, insofar as it applies to the owners of any holding company of the casino gaming operator, their affiliated companies, and all of their officers, directors, partners, senior management, and key employees. In support, the district court relied upon the reasoning of the majority of this Court in Penn v. State, 99-2337 (La.10/29/99), 751 So.2d 823, cert. denied, 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000), which declared unconstitutional provisions of La. R.S. 18:1505.2(L) barring campaign contributions by the video poker industry. The State has appealed the district court's judgment directly to this Court pursuant to La. Const. Art. V, § 5(D).

DISCUSSION
In Penn, in a four-three per curiam decision, this Court declared unconstitutional La. R.S. 18:1505.2(L)(3)(a)(i), La. R.S. 18:1505.2(L)(3)(b)(i) insofar as it is applied to La. R.S. 18:1505.2(L)(3)(a)(i), and Rule 107 of Title 42 of the Louisiana Administrative Code, insofar as Rule 107 precludes candidate and political committee contributions by video draw poker licensees.[4] For the reasons that follow, we decline to follow Penn and hold that the legislative bans on campaign contributions by riverboat gaming and land-based casino interests do not violate the First and Fourteenth Amendments to the United States Constitution.[5]
The First Amendment provides that "Congress shall make no law ... abridging the freedom of speech." U.S. Const. Amend. I. The Fourteenth Amendment makes this most important guarantee applicable to the states as well as the Congress. *498 Buckley v. Valeo is the seminal United States Supreme Court case on modern campaign finance reform in the context of the First Amendment. 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976). In reviewing the contribution[6] and expenditure[7] limits contained in the 1974 amendments to the Federal Election Campaign Act of 1971 (the "Act"),[8] the Buckley Court made clear that restrictions on campaign contributions and expenditures "operate in an area of the most fundamental First Amendment activities," namely, the rights of freedom of association and freedom of expression. 424 U.S. at 14, 96 S.Ct. 612. In discussing the Act's impact on the First Amendment's guarantee of freedom of expression, the Court distinguished between expenditure restrictions and contribution restrictions, characterizing expenditure restrictions as follows:
A restriction on the amount of money a person or group can spend on political communication during a campaign necessarily reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached. This is because virtually every means of communicating ideas in today's mass society requires the expenditure of money....
The expenditure limitations contained in the Act represent substantial rather than merely theoretical restraints on the quantity and diversity of political speech.... (Emphasis added).
424 U.S. at 19, 96 S.Ct. 612.[9]
In discussing restraints on contributions in the context of freedom of expression rights, the Court held:
By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or political committee entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves *499 as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. The quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated, symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues. While contributions may result in political expression if spent by a candidate or an association to present views to the voters, the transformation of contributions into political debate involves speech by someone other than the contributor. (Emphasis added).
Id., 424 U.S. at 21, 96 S.Ct. 612.[10] The Court made the distinction again later in the opinion when noting that "unlike a person's contribution to a candidate, a candidate's expenditure of his personal funds directly facilitates his own political speech." Id., 424 U.S. at 53, n. 58, 96 S.Ct. 612; see also California Medical Ass'n v. Federal Election Comm'n, 453 U.S. 182, 196, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (Plurality Opinion) (limits on the amounts a group may contribute to a multi-candidate political committee is "speech by proxy" and "is not the sort of political advocacy that this Court in Buckley found entitled to full First Amendment protection"); cf. Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (holding expenditure limitations on political committees unconstitutional and noting that "there is a fundamental constitutional difference between money spent to advertise views and money contributed to a candidate"); Colorado Republican Fed. Campaign Comm. v. FEC, 518 U.S. 604, 116 S.Ct. 2309, 135 L.Ed.2d 795 (1996) (Colorado I) (holding that spending limits were unconstitutional as applied to political groups independent expenditures in connection with a senatorial candidate, making explicit the distinction between expenditures coordinated with a candidate and independent expenditures); FEC v. Colorado Republican Fed. Campaign Comm., 533 U.S. 431, 121 S.Ct. 2351, 150 L.Ed.2d 461 (2001) (Colorado II) (holding that a political party's coordinated expenditures, unlike expenditures truly independent, may be restricted to minimize circumvention of contribution limits).
The Court in Buckley also held that the Act's contribution and expenditure limits "impinge on protected associational freedoms," as follows:
Making a contribution, like joining a political party, serves to affiliate a person with a candidate. In addition, it enables like-minded persons to pool their resources *500 in furtherance of common political goals. The Act's contribution ceilings thus limit one important means of associating with a candidate or committee, but leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates. And the Act's contribution limitations permits associations and candidates to aggregate large sums of money to promote effective advocacy.
Id., 424 U.S. at 22-23, 96 S.Ct. 612.
Thus, in addressing the contribution limitations, the Court held that the "primary problem raised by the Act's contribution limitations is their restriction of one aspect of the contributor's freedom of political association." Id., 424 U.S. at 24, 96 S.Ct. 612 (emphasis added).
In discussing the appropriate standard of review to be used to determine whether the contribution limitations violated the contributor's freedom of political association rights, the Buckley Court held:
In view of the fundamental nature of the right to associate, governmental "action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP v. Alabama, [357 U.S. 449, 460-461, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958)]. Yet, it is clear that "[n]either the right to associate nor the right to participate in political activities is absolute." CSC v. Letter Carriers, 413 U.S. 548, 567 [93 S.Ct. 2880, 37 L.Ed.2d 796] (1973). Even a "significant interference with protected rights of political association" may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms. Cousins v. Wigoda, [419 U.S. 477, 488, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975)]; NAACP v. Button, [371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963)]; Shelton v. Tucker, 364 U.S. 479, 488 [81 S.Ct. 247, 5 L.Ed.2d 231] (1960).
Id., 424 U.S. at 25, 96 S.Ct. 612.[11] The Supreme Court has recently identified further reasons for the differing standards of review that the Court applies to restrictions on political expenditures and political contributions as follows:
Spending for political ends and contributing to political candidates both fall within the First Amendment's protection of speech and political association. Buckley, 424 U.S. at 14-23, 96 S.Ct. 612. But ever since we first reviewed the 1971 Act, we have understood that limits on political expenditures deserve closer scrutiny than restrictions on political contributions. Ibid; see also, e.g., Shrink Missouri, 528 U.S. at 386, 120 S.Ct. 897; Colorado I, supra, at 610, 614-615, 116 S.Ct. 2309; Massachusetts Citizens for Life, 479 U.S. at 259-260, 107 S.Ct. 616. Restrictions on expenditures generally curb more expressive and associational activity than limits on contributions do. Shrink Missouri, supra, at 386-388, 120 S.Ct. 897; Colorado *501 I, supra, at 615, 116 S.Ct. 2309; Buckley, 424 U.S. at 19-23, 96 S.Ct. 612. A further reason for the distinction is that limits on contributions are more clearly justified by a link to political corruption than limits on other kinds of unlimited political spending are (corruption being understood not only as quid pro quo agreements, but also as undue influence on an officerholder's judgment, and the appearance of such influence, Shrink Missouri, supra, at 388-389, 120 S.Ct. 897). At least this is so where the spending is not coordinated with the candidate or his campaign....
Given these differences, we have routinely struck down limitations on independent expenditures by candidates, other individuals, and groups, see Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 490-501, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) (political action committees); Buckley, supra, at 39-58, 96 S.Ct. 612 (individuals, groups, candidates, and campaigns), while repeatedly upholding contribution limits, see Shrink Missouri, supra (contributions by political action committees); California Medical Assn. v. Federal Election Comm'n, 453 U.S. 182, 193-199, 101 S.Ct. 2712, 69 L.Ed.2d 567 (1981) (contributions by individuals and associations); Buckley, supra, at 23-36, 96 S.Ct. 612 (contributions by individuals, groups, and political committees).
Colorado II, supra, 533 U.S. at 440, 121 S.Ct. 2351.
In applying that standard of review and in upholding the constitutionality of the contribution limitations, the Buckley Court found that the Act's primary purpose of limiting the actuality and appearance of corruption resulting from large individual financial contributions was a constitutionally sufficient justification for the limitations. Specifically, the Court held that "[t]o the extent that large contributions are given to secure political quid pro quo's from current and potential office holders, the integrity of our system of representative democracy is undermined," and that "[o]f almost equal concern as the danger of actual quid pro quo arrangements in the impact of the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large individual financial contributions." Id., 424 U.S. at 26-27, 96 S.Ct. 612. The Court opined that "Congress could legitimately conclude that the avoidance of the appearance of improper influence `is also critical ... if confidence in the system of representative Government is not to be eroded to a disastrous extent.'" Id. (Citing CSC v. Letter Carriers, supra, 413 U.S. at 565, n. 29, 93 S.Ct. 2880).
In Penn, wherein a majority of this Court declared unconstitutional provisions of La. R.S. 18:1505.2(L) that barred campaign contributions by the video poker industry, the common thread among the four concurring opinions is the authors' beliefs that Buckley identified only a "single narrow exception" to the rule that limits on political activity are contrary to the First Amendment, and that, because the statutes at issue "prohibited" rather that "limited" the contributions, they did not fit into the "exception" and were therefore unconstitutional. See, Penn, supra (Concurring Opinion of Chief Justice Calogero at 833, 834; Concurring Opinion of Justice Johnson at 827, 831; Concurring Opinion of former Justice Lemmon at 839; Concurring Opinion of Justice Kimball at 840). These concurrences base their reasoning on language in Buckley that emphasized that the contribution limitation was only a "marginal restriction" because it still permitted "the symbolic expression of support evidenced by a contribution" even if the contribution would not be a significant one. *502 Thus, they reasoned, because the statutes at issue in Penn, like in this case, prohibit contribution, they did not allow a "symbolic expression of support" and were therefore unconstitutional.
What the majority of the court in Penn failed to realize is that under La. R.S. 18:1505.2(L), as pointed out by the Attorney General's office and the Counsel for the Supervisory Committee on Campaign Finance Disclosure in their brief to this Court, the parties prohibited from making campaign contributions to a candidate or political committee of a candidate can still make unlimited independent expenditures supporting or opposing a candidate. This allows much more room for political expression and association than the statute involved in Buckley, where the statute also limited campaign expenditures. In this case, there is no need to resort to finding a right to "the symbolic expression of support evidenced by a contribution," however small, to save this statute from the doom of unconstitutionality, as these parties still have the full right to political expression and association by making unlimited political expenditures in favor of the candidate of their choice. In addition, they have the same rights the Court recognized as significant in Buckley, i.e., they can still become a member of a political association and personally assist in the association's effort on behalf of candidates; they can still urge their employees to support or oppose particular candidates; they may still openly support individual candidates by displaying yard signs and voluntarily working in political campaigns; and they may sponsor phone banks to encourage persons to vote.
Furthermore, there is no indication in Buckley that a contribution limit of zero, as opposed to a contribution limit of $1,000.00, would be unconstitutional. In fact, since Penn, the United States Supreme Court has clarified and explained the holding in Buckley, and has specifically addressed the issue of what limit would possibly be too low to withstand constitutional scrutiny. In Nixon v. Shrink Mo. Gov't PAC, the Court held that Buckley was authority for state limits on contributions to state political candidates but that the state limits did not need to be "pegged to Buckley's dollars." 528 U.S. 377, 381, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000).[12] The Shrink Missouri court clearly stated that "[i]n Buckley, we specifically rejected the contention that $1,000 or any other amount, was a constitutional minimum below which the legislatures could not regulate." Id., 528 U.S. at 397, 120 S.Ct. 897 (emphasis added). The Court set out the proper standard for determining when a minimum might be too low to withstand constitutional scrutiny as follows:
As indicated above, [in Buckley] we referred instead to the outer limits of contribution regulation by asking whether there was any showing that the limits were so low as to impede the ability of candidates to "amass the resources necessary for effective advocacy." 424 U.S. at 21, 96 S.Ct. 612. We asked, in other words, whether the contribution limitation was so radical in effect as to render political association ineffective, drive the sound of a candidate's voice below the level of notice, and render the contributions pointless. Such being the test, the issue in later cases cannot be truncated to a narrow question about the power of the dollar, but must go to mount a campaign with all the dollars likely to be forthcoming. *503 Id. Unlike the across-the-board restrictions involved in Buckley and Shrink Missouri, the restrictions in this case involve just one licensed land-based casino and 15 licensed riverboat gaming facilities throughout Louisiana. Thus, clearly, in this case, the ban will have a very minimal effect on the candidates' ability "to amass the resources necessary for effective advocacy." Id.

We must also point out that seven other states have enacted statutes that prohibit campaign contributions by certain gaming interests.[13] Further, three other states' appellate courts that have considered whether a complete prohibition on campaign contributions, rather than a monetary limitation, is constitutional in light of Buckley have answered in the affirmative. State v. Alaska Civil Liberties Union, 978 P.2d 597 (Alaska 1999), cert. denied, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000) (upholding complete ban on campaign contributions by out-of-district lobbyists); In re Petition of Soto, 236 N.J.Super. 303, 565 A.2d 1088 (1989), certif. denied, 121 N.J. 608, 583 A.2d 310 (1990), cert. denied, 496 U.S. 937, 110 S.Ct. 3216, 110 L.Ed.2d 664 (1990) (upholding New Jersey's complete ban on campaign contributions by gaming interests; Louisiana's statute is based on this, see pp. 506-507, infra);[14]Schiller Park Colonial Inn, Inc. v. Berz, 63 Ill.2d 499, 349 N.E.2d 61 (1976) (upholding complete ban on campaign contributions by liquor licensees or their representatives).[15] In addition, two federal courts have upheld complete bans on campaign contributions by lobbyists, both holding that the fact that the contribution restrictions were bans, rather that monetary limits, did not render them unconstitutional under Buckley. North Carolina Right to Life, Inc. v. Bartlett, 168 F.3d 705 (4th Cir.1999), cert. denied, 528 U.S. 1153, 120 S.Ct. 1156, 145 L.Ed.2d 1069 (2000); Inst. of Governmental Advocates v. Fair Political Practices Comm'n, 164 F.Supp.2d 1183 (E.D.Cal.2001). Finally, corporate contributions to candidates and candidate committees have long been *504 prohibited completely at the federal level. 2 U.S.C. § 441b(a). Twenty-two states also ban corporate contributions. See, generally, Chart 2A, Federal Election Commission, E. Feigenbaum & J. Palmer, Campaign Finance Law 98 (1998).
Thus, contrary to the concurring opinions' viewpoints that carried the day in Penn, we find the fact that the campaign contribution ban found in La. 18:1505.2(L)(2) is a prohibition on contributions, rather than a limitation, does not render it per se unconstitutional under Buckley. Instead, the restriction is to analyzed under the burden of proof enunciated in Buckley, as clarified in by later Supreme Court cases, i.e., "that a contribution limit involving `significant interference' with associational rights, could survive if the Government demonstrated that the contribution regulation was "closely drawn" to match a "sufficiently important interest ..." Shrink Missouri, 528 U.S. at 387-388, 120 S.Ct. 897 (citing Buckley, 424 U.S. at 25, 96 S.Ct. 612).
In order to conduct this analysis, we must get to the heart of the matter, the history of gambling in Louisiana. This history was ably explained by Justice Knoll in her dissent in Penn:
The Louisiana Constitution of 1879 declared gambling a "vice" and the Legislature was directed to enact laws for its suppression. LA. CONST. art. 172 (1879). Louisiana's Constitutions of 1898, 1913, and 1921 all contained similar provisions regarding gambling. See LA. CONST. art. 19, Sec. 8 (1921); LA. CONST. arts. 178, 188, 189 (1913); LA. CONST. arts. 178, 188, 189 (1898). Although the delegates to the Constitutional Convention which convened on January 5, 1973, eliminated the moral condemnation of gambling and chose to suppress gambling rather than prohibit it, it is clear that the Legislature continued its role of defining gambling. Polk v. Edwards, 626 So.2d 1128, 1141 (La. 1993). Thus, the Louisiana electorate ratified the Constitution of 1974 which followed its predecessor documents with the inclusion of article XII, Sec. 6(B) that "gambling shall be defined by and suppressed by the Legislature." In order to understand the reasons for these constitutional declarations throughout the period of Louisiana's statehood, reference to the history of gambling in this State is essential.
Historically, gambling has been recognized as a vice activity which poses a threat to public health and public morals. Although the vice of gambling existed throughout the State during the eighteenth and nineteenth centuries, New Orleans was recognized as the gambling capital. See Timothy L. O'Brien, Bad Bet: The Inside Story of the Glamour, Glitz, and Danger of America's Gambling Industry (1998). The State outlawed gambling in 1812, but New Orleans received a special exemption that allowed gambling to continue.
When federal troops occupied New Orleans from 1862 to 1877, the Louisiana Lottery Company, a private corporation, went into business. O'Brien, supra, at 105-106. Even though the Constitution had previously declared lotteries illegal, a constitutional amendment was passed in 1866 and the Louisiana Lottery Corporation was given a 25-year charter to operate. Id. The Lottery was marketed nationwide via the mail and branch offices and by 1890 was taking in $28 million yearly. Id. at 106-107. Lottery proceeds not only paid for the first waterworks in New Orleans, but this lucre supported the New Orleans charity hospital and upgraded the public schools. Id. at *505 107; Stephanie A. Martz, Note, Legalized Gambling and Public Corruption: Removing the Incentive to Act Corruptly, or, Teaching an Old Dog New Tricks, 13 J.L. & Pol. 453, 458-59 (1997). In 1893, the federal government intervened in the Louisiana Lottery and passed a law prohibiting any form of lottery sales and promotion. Martz, supra at 459.
Gambling remained available in New Orleans during the first decades of the twentieth century in small establishments around the city, even though the Constitution had outlawed all gambling. O'Brien, supra, at 108. In 1934, Huey P. Long allowed slot machines in New Orleans and several casinos outside the city. Id. In the 1950s a reform movement ran the larger casinos away, but the slot machines and back-alley casinos stayed in business until the 1970s. Id. at 109.
With the boom of the petrochemical industry during the 1970s and 1980s, the State's economy was revitalized. Id. There was no longer a need for gambling proceeds to fund government projects, that is until the bottom fell out of the oil industry. See Id. However, when the State's economy went into a tailspin with the decline in the oil industry, the State Legislature, armed with its constitutional authority to "define gambling," turned to legalized gambling as a means out of the fiscal doldrums. See Id. In a series of enactments in 1991 and 1992, the Legislature passed four acts providing for the licensing of gaming, to-wit: at a land-based casino in New Orleans, La. R.S. 4:601-686; on cruise ships operating out of New Orleans, La. R.S. 14:90(B); on river boats operating on designated rivers in the state, La. R.S. 4:501-562; and by means of video poker machines located throughout the State, La. R.S. 33:4862.1-19.
In Polk, although this Court upheld the power of the Legislature to provide for the licensing of gaming, it further recognized that the Legislature's authority to regulate gambling constitutes a legitimate exercise of police power. Id. at 1137; see also Theriot v. Terrebonne Parish Police Jury, 436 So.2d 515, 516 (La.1983); State v. Mustachia, 152 La. 821, 94 So. 408 (1922); Ruston v. Perkins, 114 La. 851, 38 So. 583 (1905). "Defining and prescribing means of suppression are left to the state Legislature and the legislative determination in this regard constitutes an appropriate exercise of police power for the protection of the public." Theriot, 436 So.2d at 521. Moreover, in Polk this Court further held that the power to suppress gambling and "to determine how, when, where, and in what respects gambling shall be prohibited or permitted" has been constitutionally delegated to the Legislature. Polk, 626 So.2d at 1128.
In 1996, the Legislature, pursuant to its constitutional mandate to define and suppress gambling, enacted the Louisiana Gaming Control Law, La. R.S. 27:1-:392. From the outset, the legislation announced the public policy of this State concerning gaming. In La. R.S. 27:2(A), the Legislature stated:
The legislature hereby finds and declares it to be the public policy of the state that the development of a controlled gaming industry to promote economic development of the state requires thorough and careful exercise of legislative power to protect the general welfare of the state's people by keeping the state free from criminal and corrupt elements. The legislature further finds and declares it to be the public policy of the state that to this all persons, locations, practices, associations, and activities related to *506 the operation of licensed and qualified gaming establishments and the manufacture, supply, or distribution of gaming devices and equipment shall be strictly regulated.
This legislation further declared that any license, casino operating contract, permit, approval, or thing obtained or issued pursuant to the provisions of this Title or any other law relative to the jurisdiction of the board is expressly declared by the legislature to be a pure and absolute revocable privilege and not a right, property or otherwise, under the constitution of the United States or of the state of Louisiana.
La. R.S. 27:2(B); see also Catanese v. Louisiana Gaming Control Bd., 97-1426 (La.App. 1 Cir. 5/15/98), 712 So.2d 666, 670, writ denied, 98-1678 (La.10/09/98), 726 So.2d 30; Eicher v. Louisiana State Police, Riverboat Gaming Enforcement Div., 97-0121 (La.App. 1 Cir. 2/20/98), 710 So.2d 799, 807, writ denied, 98-0780 (La.5/8/98), 719 So.2d 51.
In the same legislative session, the Legislature enacted La. R.S. 18:1505.2(L) relative to campaign finance.
Penn, supra at 849 (Knoll, J., dissenting).
With this background in mind, the legislative intent behind the enactment of this statute can be easily gleaned from the legislative committee meeting notes. See Committee on Senate and Governmental Affairs, Verbatim Transcript Meeting of March 26, 1996, Senate Bill 12 by Senator Dardenne. Senator Dardenne introduced the bill with the following information:
... we're attempting to track as well in this legislation what was done in New Jersey [an obvious reference to the Soto case] which is the only state we know of that has imposed a statutory ban on gambling contributions.
. . .
... I think unfortunately we can make a strong argument in Louisiana that there is a compelling state interest to prevent the gambling industry from making contributions and there has been unfortunate data that would support that based upon some investigations that have been underway and the problems we've seen....
. . .
... I think that this industry stands onto itself and ought to stand onto itself as one that we ought to be singling out for the purpose of trying to limit their involvement in the legislative process and unfortunately I think it is appropriate to look to what has happened over the course of the past couple of years specifically on how individuals within the industry have been accused of attempting to influence the legislative process based upon the industry's entry into the state .... it is directed to specifically at the gambling industry and to say we believe in Louisiana; we ought to limit the gambling industry's influence in the political process.
. . .
... I will say this about this particular bill. I don't know of any other industry that was singled out in the past campaign as something for the public to look at when you had gubernatorial candidates, you had legislative candidates saying I'm not going to take money from the gambling industry or making a campaign issue over where contributions came from. This is a major, major source of concern in the minds of the public from my viewpoint as to what influence the gambling industry has had over this legislature and this government during its infancy in Louisiana and I think it is an appropriate bill to advance in the legislature to say that we *507 are going to say it is not appropriate for the gambling industry to be making political contributions.
Id.
As stated in Shrink Missouri, the Court in Buckley found "the prevention of corruption and the appearance of corruption" to be a "constitutionally sufficient justification" for campaign contribution restrictions. 528 U.S. at 388, 120 S.Ct. 897 (citing Buckley, 424 U.S. at 25-26, 96 S.Ct. 612). The obvious purpose behind the statute at issue in this case is the prevention of corruption and the appearance of corruption by the gaming industry upon the political process, and under Buckley and Shrink Missouri, this is a constitutionally sufficient justification for the campaign contribution restrictions.
The gaming interests argue that the statute is unconstitutional because it has an unlawful purpose, as stated in the statute, "to prevent influence and the appearance of influence of candidates for public office and of the election process by special interests." La. R.S. 18:1505.2(L)(2). They argue that preventing "influence" or the "appearance of influence" is not a recognized legitimate governmental interest under Buckley and its progeny. However, a clear reading of the statute in light of the history of gambling in this State along with the legislative history of the statute leaves no doubt that the purpose of the statute is to prohibit the corruption and appearance of corruption which the legislature has determined will not be permitted in the highly regulated gaming industry. As the Court explained in Shrink Missouri:
In speaking of "improper influence" and "opportunities for abuse" in addition to "quid pro quo arrangements," we recognized a concern not confined to bribery of public officials, but extending to the broader threat from politicians too compliant with the wishes of large contributors. These were the obvious points behind our recognition that the Congress could constitutionally address the power of money "to influence governmental action" in ways less "blatant and specific" than bribery.
Shrink Missouri, supra at 389, 120 S.Ct. 897 (citing Buckley, 424 U.S. at 28, 96 S.Ct. 612).[16]
The gaming interests also argue that the government's burden to show that a speech restriction actually advances the asserted governmental interest is not satisfied by mere speculation or conjecture, and that instead, the government must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree. This proposition was also offered by Justice Johnson in support of her concurring opinion in Penn. However, Shrink Missouri specifically rejected this proposition in the context of campaign contribution restrictions, holding that "as to [what is necessary as a minimum evidentiary showing], respondents are wrong in arguing that in the years since Buckley came down we have `supplemented' its holding with a new requirement that governments enacting contribution limits must `demonstrate that the recited harms are real, not merely conjectural ...'" Id., 528 U.S. at 391-92, 120 S.Ct. 897. The Court held that "the quantum of empirical evidence needed to satisfy heightened judicial scrutiny of legislative *508 judgments will vary up or down with the novelty and plausibility of the justification raised." Id.
Evidence provided to the trial court in this case included affidavits outlining the public perception that gaming is associated with political corruption, information that within the last ten years, nine states (including Louisiana) have prosecuted governmental officials in gaming cases, and statistics showing the staggering sum of money collected by those within the gaming industry. This evidence illustrates why the legislature found it was imperative to prohibit campaign contributions from persons engaged in the gaming industry. Given the history of the gaming industry and its connection to public corruption and the appearance of public corruption, it is completely plausible, and not at all novel, for the Louisiana legislature to have concluded that it was necessary to distance gaming interests from the ability to contribute to candidates and political committees which support candidates. See also Shrink Missouri, 528 U.S. at 390, 120 S.Ct. 897 ("Buckley demonstrates that the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible").
The United States Supreme Court has also repeatedly rejected the gaming interests' argument that the statute is not "closely drawn" to support a sufficiently important government interest because there are less restrictive measures on the books, such as contribution limits,[17] disclosure laws[18] and anti-bribery statutes, that would solve the problem that this more restrictive statute seeks to address. The Buckley Court rejected the argument that the contribution limits must be invalidated because bribery laws and narrowly drawn disclosure requirements constitute a less restrictive means of dealing with the problem, finding that bribery laws only criminalize the most blatant attempts to influence governmental action and that Congress was entitled to conclude that the disclosure provisions were only a partial measure. Buckley, supra, 424 U.S. at 27-28, 96 S.Ct. 612. The Court concluded that the Act's contribution limitation "focuses precisely on the problem of large campaign contributionsthe narrow aspect of political association where the actuality and potential for corruption have been identifiedwhile leaving persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a limited but nonetheless substantial extent in supporting candidates and committees with financial resources." Id.; see also Shrink Missouri, supra, 528 U.S. at 396, 120 S.Ct. 897; California Medical Ass'n, supra, 453 U.S. at 199, n. 20, 101 S.Ct. 2712 (concluding that a limit on the amount that unincorporated associations could contribute to political committees was not required to be the least restrictive means of accomplishing the intent of the statute and that Congress could have reasonably concluded that the statute was a useful supplement to other anti-fraud provisions).
For the same reasons, we also reject the gaming interests' argument that the statute serves no legitimate purpose because other statutes, such as La. R.S. 27:310(B)-(C) already impose rigorous background checks and strict licensing restrictions on gaming interests, guaranteeing that anyone who obtains a gaming interest is "suitable" and honest.
*509 Further, we note that there are significant differences between the video poker industry, as addressed in Penn, and the riverboat and land-based casino gaming industries. For example, there are no limits on the number of persons who may be licensed to operate video poker in this state. In contrast, the Legislature has authorized only a single land-based casino and only 15 riverboats. La. R.S. 27:241 and 27:65. Another notable distinction is that the prohibitions at issue in Penn did not apply equally to all persons engaged in the video poker industry. Penn, supra at 830 (Johnson, J., concurring). In contrast, the restrictions applicable to those involved in the riverboat and land-based casino gaming industries are uniform.

CONCLUSION
Restrictions on campaign contributions operate in an area protected by the First Amendment, particularly the right of freedom of association. However, a campaign contribution restriction, including a complete ban on campaign contributions, can withstand constitutional scrutiny if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms. Thus, under Buckley and its progeny, we find that the campaign contribution restrictions on the riverboat and land-based casino gaming industries are closely drawn to match a sufficiently important interest in that they focus precisely on the problem of campaign contributions by the gaming industry the narrow aspect of political association where the actuality and potential for corruption have been identifiedwhile leaving such persons free to engage in independent political expression, to associate actively through volunteering their services, and to assist to a substantial extent in supporting candidates and committees by making independent expenditures.[19] Therefore, we find that the provisions of La. R.S. 18:1505.2(L) which prohibit riverboat and land-based casino gaming interests from making campaign contributions to candidates or to political committees of candidates do not violate the First Amendment.[20]

*510 DECREE
For the foregoing reasons, we reverse the judgment of the trial court and uphold the constitutionality of La. R.S. 18:1505.2(L)(3)(a)(ii) and La. R.S. 18:1505.2(L)(3)(b)(c)(e), insofar as they are applicable to La. R.S. 18:1505.2(L)(3)(a)(ii) and (iii), as well as 42 LA ADC Pt. IX, § 2941, insofar as it applies to the owners of any holding company of the casino gaming operator, their affiliated companies, and all of their officers, directors, partners, senior management and key employees.
REVERSED.
CALOGERO, C.J., dissents and assigns reasons.
KIMBALL, J., dissents and assigns reasons.
JOHNSON, J., dissents and assigns reasons.
CALOGERO, Chief Justice, dissents and assigns the following reasons:
I dissent from the majority's disposition upholding the constitutionality of the certain provisions of La.Rev.Stat. 18:1505.2(L) prohibiting campaign contributions from the riverboat and land-based casino industry because I find this case indistinguishable from our recent decision in Penn v. State, 99-2337 (La.10/29/99), 751 So.2d 823, cert. denied, 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000), in which we declared unconstitutional certain provisions of La.Rev.Stat. 18:1505.2(L) prohibiting campaign contributions by the video poker industry. The provisions at issue in this case, like the provisions at issue in Penn, are an absolute prohibition to candidate and political committee contributions by casinos, not merely a limit on such contributions. The provisions thus entirely disallow the symbolic act of contribution. Therefore, as the majority of this court found in Penn, I find in this case that the contested provisions' complete prohibition of contributions is more than merely a "marginal restriction" on the casino's First Amendment rights as allowed by Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and therefore cannot be outweighed by the government's interest in preventing "political corruption."
Furthermore, I do not believe that the United State's Supreme Court's more recent decision of Nixon v. Shrink Missouri Government PAC, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), is applicable to this case. I disagree with the majority that Shrink Missouri sets out the burden of proof that the government must meet in analyzing this particular restriction on campaign contributions. Shrink Missouri involved a "contribution limit," not a contribution prohibition, a critical distinction recognized by this court in Penn.
Although the majority attempts to distinguish this case from Penn, I do not believe a significant distinction exists, and therefore, I believe that the majority's decision effectively overrules our prior jurisprudence on this issue. Because I believe our decision in Penn is correct, I respectfully dissent from the majority's decision, and I would find unconstitutional the provisions of La.Rev.Stat. 18:1505.2(L) prohibiting campaign contributions by the riverboat and land-based casino industry.
KIMBALL, Justice, dissenting.
Because I continue to adhere to the view expressed in my concurrence in Penn v. State, 99-2337 (La.10/29/99), 751 So.2d 823, 839 (Kimball, J. concurring), I dissent from the majority's conclusion that the provisions at issue are constitutional. Like the *511 provisions held unconstitutional in Penn, the instant prohibitions illegally infringe on protected First Amendment rights.
In stark contrast to the laws at issue in Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000) and Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), which dealt with limits on campaign contributions, the challenged provisions in the case at bar deal with absolute prohibitions on campaign contributions made by certain targeted persons. In Shrink Missouri, a case decided after this court rendered its decision in Penn, the U.S. Supreme Court quoted language from Buckley explaining that a contribution limit only marginally restricts a contributor's ability to engage in free communication because while a contribution serves as a general expression of support for the candidate and his views, it does not communicate the underlying basis for the support. Shrink Missouri, 528 U.S. at 386, 120 S.Ct. at 903. Further, the Shrink Missouri Court quoted Buckley for the proposition that
[t]he quantity of communication by the contributor does not increase perceptibly with the size of his contribution, since the expression rests solely on the undifferentiated symbolic act of contributing. At most, the size of the contribution provides a very rough index of the intensity of the contributor's support for the candidate. A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.
Shrink Missouri, 528 U.S. at 386-87, 120 S.Ct. at 903-4 (quoting Buckley, 424 U.S. at 20-21, 96 S.Ct. at 635-36). Thus, a contribution limit leaves communication significantly unimpaired. Shrink Missouri, 528 U.S. at 387, 120 S.Ct. at 904. Clearly, the Shrink Missouri Court did not diminish the importance of the symbolic expression evidenced by a contribution of any amount.
Contribution limits also impinge on protected associational freedoms. Shrink Missouri, 528 U.S. at 387, 120 S.Ct. at 904; Buckley, 424 U.S. at 22, 96 S.Ct. at 636. Justice Breyer, joined in his concurrence by Justice Ginsburg, noted that the statute upheld by the Court did not impose an absolute ban on contributions. Rather, Justice Breyer stated, it "imposes restrictions of degree. It does not deny the contributor the opportunity to associate with the candidate through a contribution, though it limits a contribution's size." Shrink Missouri, 528 U.S. at 401, 120 S.Ct. at 912 (Breyer, J. concurring). Such a statement identifies the difference between a law that limits contributions and one that absolutely prohibits them. In my view, a prohibition against campaign contributions by certain persons allows neither the "symbolic expression" evidenced by a contribution nor the affiliation with a candidate that a contribution allows. This amounts to a "difference in kind" rather than a "distinction in degree" when compared to the laws upheld in Shrink Missouri and Buckley. See Penn, 751 So.2d at 841 (Kimball, J. concurring).
The majority opinion treats in a cavalier manner the significance of the difference between laws that limit campaign contributions and those that prohibit such contributions. The majority notes that the parties prohibited from making contributions by the provisions at issue can still make unlimited political expenditures, personally assist in a political association's effort on behalf of candidates, urge their *512 employees to support or oppose particular candidates, display yard signs, volunteer in political campaigns, and sponsor phone banks to encourage persons to vote. However, individuals might contribute funds to a candidate's campaign in part because they believe such a contribution is a more effective means of advocacy than spending the money on their own. See FEC v. Massachusetts Citizens for Life, 479 U.S. 238, 261, 107 S.Ct. 616, 629, 93 L.Ed.2d 539 (1986); Beaumont v. FEC, 278 F.3d 261, 274 (4th Cir.2002). Moreover, given the complete ban on contributions at issue in this case, it seems worthwhile to address the Supreme Court's pronouncement that "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." Spence v. State of Washington, 418 U.S. 405, 411 n. 4, 94 S.Ct. 2727, 2731 n. 4, 41 L.Ed.2d 842 (1974) (quoting Schneider v. State of New Jersey, 308 U.S. 147, 163, 60 S.Ct. 146, 151, 84 L.Ed. 155 (1939)).
The majority correctly recites the standard of review to be used to determine whether the contribution limitations violate the contributor's First Amendment rights, i.e., a contribution limit involving significant interference with associational rights can survive if the Government demonstrates that the contribution regulation is closely drawn to match a sufficiently important interest, but then fails to accurately apply it to the facts at hand. Because the instant case involves a complete ban on contributions, the State's burden to show that the prohibitive laws are "closely drawn" becomes even more onerous. Beaumont, 278 F.3d at 276 ("Yet, when a limit becomes a ban, the burden of demonstrating that the regulation is closely drawn becomes that much more difficult."). In my opinion, the State fails to carry its burden, especially in light of the fact that persons subject to the contribution prohibition at issue are subject to the general contribution limits similar to those upheld in Buckley and Shrink. Additionally, the State has failed to show why a prohibition, rather than an even lower contribution cap than that allowed by the general law, is necessary.
For all the above reasons and for the reasons I expressed in my concurrence in Penn, I must dissent from the majority's holding that the contribution prohibitions at issue are valid.
JOHNSON, J., dissenting.
In Penn v. State, 99-2337 (La.10/29/99), 751 So.2d 823,[1] this court declared unconstitutional certain provisions of LSA R.S. 18:1505.2(L) which precluded campaign contributions by video poker licensees. Today, the majority has upheld the constitutionality of laws which prohibit casino licensees from making campaign contributions. For the reasons expressed in my concurrence in Penn, I respectfully dissent.
In Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976), and more recently in Nixon v. Shrink Missouri Gov't PAC, 528 U.S. 377, 120 S.Ct. 897, 145 L.Ed.2d 886 (2000), the United States Supreme Court dealt with the issue of limitations on campaign contributions and expenditures. In Buckley, the Court stated:
The [Federal Election Campaign] Act's contribution and expenditure limitations operate in an area of the most fundamental First Amendment activities. Discussion of public issues and debate on the qualifications of candidates are integral to the operation of the system of government established by our Constitution. The First Amendment affords *513 the broadest protection to such political expression in order "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." Roth v. United States, 354 U.S. 476, 484, 77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498 (1957)..... As the Court observed in Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."
Buckley, 424 U.S. at 14-15, 96 S.Ct. at 632.
As I stated in my concurring opinion in Penn, the "acceptance of a [gaming] license does not require the relinquishment of First Amendment rights to free speech and association." 751 So.2d 823, 831 (Johnson, J. concurring). Moreover, under Buckley and its progeny, an absolute ban on political contributions by any targeted group should not be allowed. In my mind, such prohibitions are clearly violative of the First and Fourteenth Amendments to the United States Constitution.
NOTES
[1] CAL is a corporation which represents the interests of the owners and operators of riverboat casinos within this state.
[2] TCC is a member of CAL and is licensed by the State to conduct riverboat gaming operations upon its licensed riverboat located in Kenner, Louisiana.
[3] Harrah's, through certain subsidiaries, is authorized to conduct riverboat gaming operations upon three licensed riverboats, one of which is located in Shreveport, Louisiana, and two of which are located in Lake Charles, Louisiana, and also owns a 49% interest in JCC Holding Co., the sole member of the land-based casino gaming operator, Jazz Casino Company LLC ("JCC").
[4] In Penn, Chief Justice Calogero, Justices Kimball and Johnson, and former Justice Harry Lemmon, issued concurring opinions and the author of this opinion and Justices Traylor and Knoll issued dissenting opinions.
[5] The per curiam opinion in Penn noted that while other sections of La. R.S. 18:1505.2(L) also prohibit certain persons from contributing to candidates and political committees of candidates, those sections were not under attack in Penn and therefore Penn did not consider the validity of those provisions. 751 So.2d at 824, n. 2.
[6] The Act defines a "contribution" as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for Federal office;" or "the payment by any person of compensation for the personal services of another person which are rendered to a political committee without charge for any purpose." 2 U.S.C. 431(8).
[7] The Act defines an "expenditure" as "any purchase, payment, distribution, loan, advance, deposit, or gift of money or anything of value, made by any person for the purpose of influencing any election for Federal office." 2 U.S.C. 431(9)(A)(i). An "expenditure" is also a "written contract, promise, or agreement to make an expenditure."
[8] The statutes at issue, Federal Election Campaign Act of 1971, 86 Stat. 3, as amended by the Federal Election Campaign Act Amendments of 1974, 88 Stat. 1263, contained the following provisions: individual political contributions are limited to $1,000 to any single candidate per election, with an overall annual limitation of $25,000 by any contributor; independent expenditures by individuals and groups "relative to a clearly identified candidate" are limited to $1,000 a year; campaign spending by candidates for various federal offices and spending for national conventions by political parties are subject to prescribed limits; contributions and expenditures above certain threshold levels must be reported and publicly disclosed.
[9] Accordingly, the Court held that the constitutionality of the Act's expenditure ceilings turned "on whether the governmental interests advanced in its support satisfy the exacting scrutiny applicable to limitations on core First Amendment rights of political expression" and held that the expenditure ceilings were unconstitutional because they "place substantial and direct restrictions on the ability of candidates, citizens, and associations to engage in protected political expression, restrictions that the First Amendment cannot tolerate." Id., 424 U.S. at 46, 58-59, 96 S.Ct. 612.
[10] In Brown v. State ex rel. Department of Pub. Safety and Corrections, this Court held that the provisions of La. R.S. 27:13(C)(6), which prohibited members or employees of the Louisiana Gaming Control Board from making contributions to committees supporting or opposing issues, i.e., independent expenditures not linked to a candidate, were unconstitutional. 96-2204 (La.10/15/96), 680 So.2d 1179 (Victory, J., not on panel). While a prohibition in La. R.S. 27:13(C)(6) regarding campaign contributions to a candidate was not at issue in Brown, this Court made clear that "there is a fundamental constitutional difference between money spent to advertise views and money contributed to a candidate." Id. at 1182.
[11] The Court in Shrink Missouri, infra, explained the standard of review as it applied to the correlative speech and association rights as follows:

While [in Buckley] we did not attempt to parse distinctions between the speech and association standards of scrutiny form contribution limits, we did make it clear that those restrictions bore more heavily on the associational right than on freedom to speak. 424 U.S. at 24-25, 96 S.Ct. 612. We consequently proceeded on the understanding that a contribution limitation surviving a claim of associational abridgment would survive a speech challenge as well, and we held the standard satisfied by the contribution limits under review.
528 U.S. at 388.
[12] Shrink Missouri involved a Missouri statute which imposed contribution limits ranging from $250 to $1,000, subject to adjustment each even-numbered year based the cumulative consumer price index.
[13] Indiana, Ind. Stats. X-XX-XX-X.1 (prohibits contributions from any officer or person who holds an interest in a gaming entity); Iowa, Iowa Stats. 99F.6(4)(a) (prohibits contributions from riverboat gambling corporations); Kentucky, Rev. Stats. 154(a).160 (prohibits contributions from persons owning lottery contracts); Michigan, Mich. Stats. 7(b)(4)-(5) (prohibits contributions from any licensee or person who has an interest in a gaming entity); Nebraska, Neb. Stats. 49-1469.01 (prohibits contributions from lottery contractors for duration of contract and three years after); New Jersey § 5:12-138 (prohibits contributions from casino officers or key employees); Virginia, § 59.1-375, 376 (prohibits contributions from pari-mutual corporations, executives and their spouses and families).
[14] In Petition of Soto, a casino employee challenged the constitutionality of a New Jersey statute that prohibited any casino key employee from contributing any money or thing of value to any political candidate or committee of any political party. In holding the statute constitutional, the court found a compelling state interest in preventing the appearance of impropriety given the "acknowledged vulnerability of the casino industry to organized crime and the compelling interest in maintaining the public trust, not only in the casino industry but also the governmental process which so closely regulates it." 565 A.2d at 1098. In addition, the court found that the statute had been narrowly drawn and precisely tailored, commenting that gambling "is an activity rife with evil" and that it was the pronounced policy of the State "to regulate and control the casino industry with the utmost strictness." Id.
[15] Other courts have also upheld campaign contribution restrictions of certain regulated industries and professions. See Blount v. SEC, 61 F.3d 938, 941-48 (D.C.Cir.1995) (upholding regulation restricting ability of municipal securities professionals to contribute to or solicit contributions for political campaigns of elected officials from whom they may obtain business);
[16] See also Federal Election Comm'n v. National Conservative Political Action Comm., 470 U.S. 480, 497, 105 S.Ct. 1459, 84 L.Ed.2d 455 (1985) ("Corruption is a subversion of the political process. Elected officials are influenced to act contrary to their obligations of office by the prospect of financial gain to themselves or infusions of money into their campaigns").
[17] La. R.S. 18:1505.2(H)(1)(a).
[18] La. R.S. 18:1482 et seq.
[19] Having found no First Amendment violation in the provisions of La. R.S. 18:1505.2(L) which prohibit riverboat gaming and landbased casino interests from making campaign contributions, we need not address the argument that the statute conflicts with the "doctrine of unconstitutional conditions." See 44 Liquormart v. Rhode Island, 517 U.S. 484, 513, 116 S.Ct. 1495, 134 L.Ed.2d 711 (1996).
[20] The riverboat and land-based casino gaming interests also argue that the statutes at issue are violative of the equal protection clause of the Fourteenth Amendment. They argue that the statute respects the right of some persons to associate and speak in support of political candidates, but strips that right from others, i.e., those who work in the gaming industry. The trial court did not address this issue, specifically stating "[h]aving found that La. R.S. 18:1505.2(L)(a)(ii) and La. R.S. 18:1505.2(L)(3)(b)(c)(e), insofar as they are applicable to La. R.S. 18:1505.2(L)(3)(a)(ii), are unconstitutional [under the First and Fourteenth Amendments], there is no need for this Court to address the Equal Protection arguments of the parties."

Article V, Section 5(F) of the Louisiana Constitution provides that if the Supreme Court has appellate jurisdiction under Section 5, then that jurisdiction may extend over all issues involved in the civil action before it. "However, this Court has repeatedly interpreted Article V, Section 5(F) to mean that our appellate jurisdiction does not extend over all issues raised in the plaintiff's petition, but only those on which the trial court has ruled." Cat's Meow, Inc. v. City of New Orleans Through Dept. of Finance, 98-0601 (La.10/20/98), 720 So.2d 1186, 1199; Church Point Wholesale Beverage Co. v. Tarver, 614 So.2d 697 (La.1993). Accordingly, because the trial court specifically did not rule on the allegation that the statute at issue violated the equal protection clause of the Fourteenth Amendment, this Court is without jurisdiction under Article V to rule on this issue on direct appeal.
[1] Cert. denied, 529 U.S. 1109, 120 S.Ct. 1962, 146 L.Ed.2d 793 (2000).