PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 18-3325
_____

PASQUALE T. DEON, SR.;
MAGGIE HARDY MAGERKO

v.

DAVID M. BARASCH; KEVIN F. O'TOOLE; RICHARD
G. JEWELL; SEAN LOGAN; KATHY M. MANDERINO;
WILLIAM H. RYAN, JR., Member, PA Gaming Control
Board, in his official capacity; DANTE SANTONI, JR.,
Member, PA Gaming Control Board, in his official capacity;
PAUL MAURO, Director, PA Gaming Control Board's
Bureau of Investigation and Enforcement, in his official
capacity; CYRUS PITRE, Director, PA Gaming Control
Board's Office of Enforcement Counsel, in his official
capacity; ATTORNEY GENERAL PENNSYLVANIA;
MERRITT C. REITZEL,
                                        Appellants
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania

(District Court Civil No. 1-17-cv-01454)
District Judge:  Honorable Sylvia H. Rambo

Argued June 11, 2019

BEFORE:  JORDAN, BIBAS,
and NYGAARD, *Circuit Judges*


(Filed May 29, 2020)

Howard G. Hopkirk [Argued]
Office of Attorney General of Pennsylvania
Strawberry Square
Harrisburg, PA 17120

   *Counsel for Appellant, David M. Barasch*

Ilana H. Eisenstein
Ben C. Fabens-Lassen
Courtney G. Saleski
DLA Piper
1650 Market Street
One Liberty Place, Suite 5000
Philadelphia, PA 19103

John J. Hamill [Argued]
DLA Piper
444 West Lake Street, Suite 900
Chicago, IL 60606

Timothy J. Lowry
DLA Piper
17 Gordon's Alley
Atlantic City, NJ 08401

Jesse C. Medlong
Amanda L. Morgan
DLA Piper
555 Mission Street, Suite 2400
San Francisco, CA 94105

*Counsel for Appellee, Pasquale T. Deon, Sr.*

Lee K. Goldfarb
Alexander W. Saksen
Gordon Rees Scully Mansukhani
707 Grant Street, Suite 3800
Pittsburgh, PA 15219

*Counsel for Appellee, Maggie Hardy Magerko*

William W. Warren, Jr.
Saul Ewing Arnstein & Lehr
2 North Second Street
Penn National Insurance Plaza, 7th Floor
Harrisburg, PA 17101

*Counsel for Amicus Appellants, Campaign Legal Center and Common Cause*

Burt M. Rublin
Ballard Spahr

1735 Market Street, 51st Floor
Philadelphia, PA 19103

> *Counsel for Amicus Appellees, Penn National Gaming,*
> *Inc. and Mountainview Thoroughbred Racing*
> *Association, Inc.*

Michael M. Miller
Kevin M. Skjoldal
Eckert Seamans Cherin & Mellott
213 Market Street, 8th Floor
Harrisburg, PA 17101

> *Counsel for Amicus Appellees, Downs Racing,*
> *Greenwood Gaming and Entertainment, and Stadium*
> *Casino, LLC*

_____

OPINION OF THE COURT
_____

NYGAARD, *Circuit Judge.*

Section 1513 of the Pennsylvania Race Horse Development and Gaming Act[1] prevents appellees Pasquale T. Deon, Sr. ("Deon") and Maggie Hardy Magerko ("Hardy") from making any political contributions because they hold interests in businesses that have gaming licenses. They sued

---

[1] 4 Pa. Cons. Stat. § 1101 et seq. (2010).

the Gaming Board[2] and the Attorney General of Pennsylvania (collectively "the Commonwealth") claiming First Amendment and Equal Protection violations. The District Court concluded "that Section 1513 of the Gaming Act furthers a substantially important state interest" in preventing quid pro quo corruption.[3] But it ruled that the restriction it imposes on political contributions is unconstitutional because the Commonwealth did not draw it closely enough. It granted summary judgment in favor of Deon and Hardy, permanently enjoining enforcement of this section of the Act.[4]

---

[2] Deon and Hardy sued Appellants in their official capacities. Appellant David M. Barasch, Richard G. Jewell, Sean Logan, Kathy M. Manderino, Merritt C. Reitzel, Obra S. Kernodle, IV and Dante Santoni Jr. are members of the Gaming Board. Appellant Kevin F. O'Toole is the Executive Director of the Board. Appellant Paul Mauro is the Director of the Board's Bureau of Investigation and Enforcement. Appellant Cyrus Pitre is the Director of the Board's Office of Enforcement Counsel. Appellant Josh Shapiro is the Attorney General of the Commonwealth of Pennsylvania. The appellants are charged with enforcing Section 1513 of the Gaming Act. *See* 4 Pa. Cons. Stat. §§ 1202, 1517(a.1), 1517(a.2), 1517(c.1).

[3] *Deon v. Barasch,* 341 F. Supp. 3d 438, 454 (M.D. Pa. 2018). But, referencing *Nixon v. Shrink Missouri Gov't. PAC*, 528 U.S. 377 (2000), it recognized that "there may be cause for some increased scrutiny of the legislature's determination," and concluded that the Commonwealth "failed to show a heightened justification for political contribution restrictions analogous to the government contracting and lobbying industries." *Id.* at 443-44.

[4] *Id*. at 454. We must also pause here to note and complement the District Judge on her thorough examination of the evidence

5

The Commonwealth says the District Court erred because Section 1513 is a critical element of a robust effort to prevent well-documented corruption in the gaming industry from taking root in Pennsylvania. They contend that the District Court's order will make it impossible to take proactive steps to protect against a known threat to its integrity.

It is axiomatic that a democratic government must make every effort to fight corruption, and the perception of it, to protect the integrity of its electoral, legislative, and regulatory processes. But when it acts it must be mindful of the fundamental speech and associational rights guaranteed by the First Amendment of the United States Constitution at stake.[5] We conclude that the District Court did not err and we will affirm the order.

I.

A.

*The Contribution Restriction.* In 2004, the Gaming Act legalized casinos and racehorse tracks in Pennsylvania. It also established the Gaming Control Board, tasking it with regulating the industry and issuing slot machine licenses. Section 1513 imposes a political contribution restriction.

---

presented, and the scholarship with which she developed and applied the law.

[5] *See McCutcheon v. Federal Election Comm'n*, 572 U.S. 185, 218 (2014).

The following persons shall be prohibited from contributing any money or in-kind contribution to a candidate for nomination or election to any public office in this Commonwealth, or to any political party committee or other political committee in this Commonwealth or to any group, committee or association organized in support of a candidate, political party committee or other political committee in this Commonwealth: (1) An applicant for a slot machine license, manufacturer license, supplier license, principal license, key employee license, interactive gaming license or horse or harness racing license. (2) A slot machine licensee, licensed manufacturer, licensed supplier, interactive gaming operator or licensed racing entity. (3) A licensed principal or licensed key employee of a slot machine licensee, licensed manufacturer, licensed supplier, interactive gaming operator or licensed racing entity. (4) An affiliate, intermediary, subsidiary or holding company of a slot machine licensee, licensed manufacturer, licensed supplier, interactive gaming operator or

7

licensed racing entity. (5) A licensed principal or licensed key employee of an affiliate, intermediary, subsidiary or holding company of a slot machine licensee, licensed manufacturer, licensed supplier, interactive gaming operator or licensed racing entity. (6) A person who holds a similar gaming license in another jurisdiction and the affiliates, intermediaries, subsidiaries, holding companies, principals or key employees thereof.[6]

The Commonwealth intended the political contribution restriction in Section 1513 (in the original language of the Act) to "prevent the actual or appearance of corruption that may result from large campaign contributions; ensure the bipartisan administration of this part; and avoid actions that may erode public confidence in the system of representative government."[7] But a casino owner sued and successfully argued that this restriction violated Free Speech rights guaranteed by the Pennsylvania Constitution.[8] The Pennsylvania Supreme Court ruled:

Here, we have found a wholesale banning of political contributions

---

[6] 4 Pa. Con. Stat. § 1513 (2010).

[7] 4 Pa. Con. Stat. § 1102 (2004).

[8] *DePaul v. Commonwealth*, 969 A.2d 536 (Pa. 2009); Pa. Const. art. 1, § 7.

to be impermissible when read in light of the legislative purpose of addressing the impact of large contributions on public confidence and trust. In this context, it is apparent that the scope of the impermissible effects, i.e., the banning of small contributions and/or contributions unlikely to affect public confidence, is quite substantial.[9]

So Pennsylvania lawmakers amended the Act to read as follows:

The General Assembly has a compelling interest in protecting the integrity of both the electoral process and the legislative process by preventing corruption and the appearance of corruption which may arise through permitting *any type of political campaign contributions* by certain persons involved in the gaming industry and regulated under this part. Banning *all types of political campaign contributions* by certain persons subject to this part is necessary to prevent corruption and the appearance of corruption

---

[9] *DePaul*, 969 A.2d. at 553.

that may arise when political campaign contributions and gaming regulated under this part are intermingled. It is necessary to maintain the integrity of the regulatory control and legislative oversight over the operation and play of slot machines, table games and interactive gaming in this Commonwealth; to ensure the bipartisan administration of this part; and avoid actions that may erode public confidence in the system of representative government.[10]

Lawmakers left the restriction in Section 1513 intact, changing instead the focus of the statement of legislative intent from "large contributions" to "all types of political contributions." That language remains today.

## B.

*Applicability*. Deon is a shareholder of Sands Pennsylvania Inc., and it owns 90 percent of privately held Sands Bethworks Gaming LLC ("Sands"). Section 1513 imposes political contribution restrictions on an array of people and entities with financial interests in gaming industry operations.[11] The portion of Section 1513 relevant to Deon is

---

[10] 4 Pa. Cons. Stat. § 1102 (amended 2010, Jan. 7, P.L. 1, No. 1, § 1, imd.) (emphases added).
[11] § 1513(a).

the application of the restriction to a "licensed principal . . . of a slot machine licensee."[12] The term "principal"[13] is defined as "[a]n officer; director; person who directly holds a beneficial interest in or ownership of the securities of an applicant or licensee; person who has a controlling interest in an applicant or licensee, or has the ability to elect a majority of the board of directors of a licensee or to otherwise control a licensee. . . ."[14] Sands has held a "Category 2" slot machine license since 2005.[15] Deon has a "controlling interest" in Sands under the Act and has been licensed as a principal since it obtained its license.

As for Hardy, Section 1325(d)(1) of the Gaming Act states the following: "No trust or similar business entity shall be eligible to hold any beneficial interest in a licensed entity under this part unless each trustee, grantor and beneficiary of the trust, including a minor child beneficiary, qualifies for and is granted a license as a principal."[16] Hardy is the beneficiary of a trust that owns Nemacolin Woodlands, Inc. ("Nemacolin") Nemacolin owns the privately held Woodlands

---

[12] *Id.*

[13] Consistent with the District Court we refer to Deon and Hardy as "principals" and not "key employee qualifier," a title previously used in reference to them. *See Deon,* 341 F. Supp. 3d at 440 n. 1 (citing 2006 Pa. Legis. Serv. Act 2006-135 (S.B. 862) (Nov. 1, 2006); 37 Pa. Bull. 2808 (June 23, 2007)).

[14] § 1103.

[15] A Category 2 license authorizes operation of slot machines in a stand-alone facility.  § 1513(a)(2); *see Riverwalk Casino, LP v. Pennsylvania Gaming Control Bd.*, 926 A.2d 926, 930 (Pa. 2007).

[16] 4 Pa. Cons. Stat. § 1325(d)(1).

Fayette, LLC. which has a "Category 3" slot machine license.[17] Hardy has been licensed as a principal since the Pennsylvania Supreme Court confirmed approval of Nemacolin's license. No one disputes that Section 1513 applies to either Deon or Hardy.

## C.

*The Constitutional Harm.* Deon and Hardy claim the Section 1513 restriction on political contributions significantly infringes on their political speech. Deon portrays himself as a politically engaged citizen and says he regularly contributed to candidates from 1978 until the Gaming Act in 2004 became law, preventing him from continuing to do so.[18] Similarly, Hardy made political contributions up through the time she obtained a Gaming Act license. She has made none since then. If either violates Section 1513 they can be charged with a third-degree misdemeanor, causing a fine of no less than $100,000 and a suspension of their license. The suspension lengthens with each violation up to and revocation of the license.[19]

Because of this Deon and Hardy requested declaratory and injunctive relief. They say Section 1513 infringes their associational rights (and the right of similarly situated gaming-

---

[17] A Category 3 license authorizes operation of slot machines in a hotel or resort. § 1513(a)(5); *see Riverwalk Casino, LP*., 926 A.2d at 930.

[18] Deon made a political contribution in 2009, after the Pennsylvania Supreme Court enjoined § 1513. He has made no contributions since the Commonwealth amended the Gaming Act in 2010.

[19] § 1513(c).

license applicants, licensees and principles of licensees), protected by the First Amendment of the United States Constitution.[20]  They also claim that Section 1513 violates the Equal Protection Clause of the Fourteenth Amendment.[21]  The District Court granted summary judgment in their favor on the First Amendment claim, enjoining Section 1513.

## II.

### A.[22]

Participating in the election of our governmental representatives is the essence of our democracy, and so political expression enjoys broad protection under the First Amendment "to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people."[23]  The protection of free expression through speech and political association under the First Amendment extends to "[s]pending for political ends and contributing to

---

[20] U.S. Const. amend. I.

[21] U.S. Const. amend. XIV, § 1.

[22] The District Court had jurisdiction under 28 U.S.C. § 1331 and we have jurisdiction under 28 U.S.C. § 1291.  We review orders granting summary judgment de novo. *Adams Outdoor Advert. Ltd. P'ship by Adams Outdoor GP, LLC v. Pennsylvania Dep't of Transp.*, 930 F.3d 199, 205 (3d Cir. 2019).  As for the injunction, we review the District Court's "fashioning of a remedy according to an abuse of discretion standard." *Anderson v. Davila*, 125 F.3d 148, 159 (3d Cir. 1997).

[23] *Buckley v. Valeo*, 424 U.S. 1, 14 (1976) (quoting *Roth v. United States*, 354 U.S. 476, 484 (1957)).

political candidates."[24]  As a result, when government restricts political contributions to fulfill another obligation—in this case, its sacred duty to protect our democratic institutions from corruption—it has a corresponding burden to prove the constitutionality of those measures.[25]  But there are some distinctions.

Limitations on campaign expenditures are subject to strict scrutiny—meaning the government must prove that the regulations promote a "compelling interest" and are the "least restrictive means to further the articulated interest."[26]  But restricting a person's contributions to a candidate or political committee "impose[s] a lesser restraint on political speech."[27]  "Contributions lie closer to the edges than to the core of political expression."[28]  As a result, we apply intermediate scrutiny to political contribution restrictions: a "lesser but 'still rigorous standard of review.'"[29]  With that said, "[e]ven a 'significant interference with protected rights of political association' may be sustained if the State demonstrates a

---

[24] *Fed. Election Comm'n. v. Colorado Republican Fed. Campaign Comm'n.*, 533 U.S. 431, 440 (2001).
[25] *See McCutcheon*, 572 U.S. at 210.
[26] *Id.* at 197.
[27] *Id.*
[28] *Fed. Election Comm'n. v. Beaumont*, 539 U.S. 146, 161 (2003).
[29] *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 29).  *But see Beaumont*, 539 U.S. at 147-48 ("[R]estrictions on political contributions have long been treated as marginal speech restrictions subject to relatively complaisant First Amendment review."); *see also Corren v. Condos*, 898 F.3d 209, 222–23 (2d Cir. 2018).

14

sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms."[30]

## B.

Traditionally, courts have "not second-guess[ed] a legislative determination as to the need for prophylactic measures where corruption is the evil feared."[31] It was over forty years ago that the *Buckley* court examined restrictions on large political contributions in the Federal Election Campaign Act (FECA)[32] and held this is "the narrow aspect of political association where the actuality and potential for corruption have been identified."[33] *Buckley's* finding—that the threat posed by corrupt political contributions was "not an illusory one"[34]—has endured. Twenty years after *Buckley* the Court said that lawmakers' suspicions about corrupt intent behind

---

[30] *Buckley*, 424 U.S. at 25 (quoting, *Cousins v. Wigoda*, 419 U.S. 477, 488 (1975) (internal quotation marks excluded)); *see also McCutcheon*, 572 U.S. at 197.

[31] *Fed. Election Comm'n. v. Nat'l. Right to Work Comm.*, 459 U.S. 197, 210 (1982).

[32] 52 U.S.C. §§ 30101-126.

[33] *Buckley*, 424 U.S. at 28. The Court reflected on the "deeply disturbing examples" of political campaign corruption, detailed by the Court of Appeals for the District of Columbia, that surfaced after the 1972 election. *Id.* at 27. And it decided from this that "the weighty interests served by restricting the size of financial contributions to political candidates are sufficient to justify the limited effect upon First Amendment freedoms caused by the . . . contribution ceiling." *Id.* at 29.

[34] *Id.* at 27.

15

large political contributions "is neither novel nor implausible."[35] More recently, the Court rejected aggregate contribution limits in FECA[36] but noted: FECA's "base limits . . . [serve] the permissible objective of combatting corruption."[37]

But though the path blazed by *Buckley* legitimizing these restrictions is long, it is not very broad. The only anti-corruption interest identified by the Court thus far as sufficient to justify political contributions restrictions is the fight against financial quid pro quo—"dollars for political favors"—or the public perception of it.[38] *Buckley* does not extend to restrictions that just "limit the appearance of mere influence or access."[39] So when a restriction on political contributions enacted to fight corruption is challenged, part of the government's burden to justify the law is to show that it

---

[35] *Shrink Missouri Gov't. PAC*, 528 U.S. at 391. To the extent that *Shrink Missouri* refers to influence-based corruption, it is no longer good law. *See SpeechNow.org v. Fed. Election Comm'n.*, 599 F.3d 686 (D.C. Cir. 2010) (en banc).

[36] 52 U.S.C. § 30117(a)(1) (formerly 2 U.S.C. § 441(a)(1)).

[37] *McCutcheon*, 572 U.S. at 192. "[B]ase limits [restrict] how much money a donor may contribute to a particular candidate or committee." *Id.* (citing § 441(a)(1)).

[38] *See id.* at 192 (quoting *Fed. Election Commn. v. Nat'l. Conservative Political Action Comm'n.*, 470 U.S. 480, 497 (1985)); *Citizens United v. Fed. Election Commn.*, 558 U.S. 310, 359 (2010) ("When *Buckley* identified a sufficiently important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption.").

[39] *McCutcheon*, 572 U.S. at 208.

addresses quid pro quo corruption, or the appearance of it.[40] And it must do so with more than "mere conjecture."[41]

The Commonwealth argues that Section 1513 is designed to address quid pro quo corruption. But we need not decide whether it has shown this sufficiently important interest because, even if it has, we conclude that Section 1513 is not closely drawn to achieve that interest.

## C.

While recognizing that combatting corruption is a sufficiently important interest, the District Court aptly said that this interest "does not license the legislature to enact any palliative measure, regardless of its restrictiveness."[42] "[A] statute that seeks to regulate campaign contributions could itself prove an obstacle to the very electoral fairness it seeks to promote."[43] Thus, courts have to "exercise . . . independent judicial judgment" when "danger signs" arise that a restriction reaches an "outer limit[]."[44] In such cases we "must review the record independently and carefully with an eye toward assessing the statute's 'tailoring.'"[45]

---

[40] *See Shrink Missouri*, 528 U.S. at 391–92; *see also Citizens United*, 558 U.S. at 359.

[41] *McCutcheon*, 572 U.S. at 210 (quoting *Shrink Missouri*, 528 U.S. at 392).

[42] *Deon*, 341 F. Supp. 3d at 451.

[43] *Randall v. Sorrell,* 548 U.S. 230, 249 (2006).

[44] *Id.*

[45] *Id.*

The parties dispute whether strict or intermediate scrutiny applies here. But even if we apply a "lesser but still 'rigorous'"[46] intermediate threshold by examining whether the statute is "closely drawn" the Commonwealth still does not meet its burden. Under that standard, the law need not be the least restrictive means available.[47] We ask, instead, whether the government has made its case that the scope of the provision is "'in proportion to the interest served.'"[48] "Fit matters."[49]

The *McCutcheon* court examined assertions that aggregate contribution limits were necessary to prevent circumvention of base limits. In its analysis of "fit" it said the following:

> [T]he cited sources do not provide any real-world examples of circumvention of the base limits along the lines of the various hypotheticals. The dearth of FEC

---

[46] *McCutcheon*, 572 U.S. at 197 (quoting *Buckley*, 424 U.S. at 29).

[47] *See McCutcheon*, 572 U.S. at 218.

[48] *Id.* at 218 (quoting *Board of Trs of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 480 (1989) and *In re R.M.J.*, 455 U.S. 191 (1982)); *see Fox,* 492 U.S. at 480 ("[A] fit that is not necessarily perfect, but reasonable; that represents not necessarily the single best disposition but one whose scope is 'in proportion to the interest served,' ... that employs not necessarily the least restrictive means but . . . a means narrowly tailored to achieve the desired objective.").

[49] *McCutcheon*, 572 U.S. at 218.

prosecutions, according to the dissent, proves only that people are getting away with it. And the violations that surely must be out there elude detection "because in the real world, the methods of achieving circumvention are more subtle and more complex" than the hypothetical examples. This sort of speculation, however, cannot justify the substantial intrusion on First Amendment rights at issue in this case.[50]

From this it concluded:

Based on what we can discern from experience, the indiscriminate ban on all contributions above the aggregate limits is disproportionate to the Government's interest in preventing circumvention. The Government has not given us any reason to believe that parties or candidates would dramatically shift their priorities if the aggregate limits were lifted."[51]

---

[50] *Id.* at 217–18.
[51] *Id.* at 220.

19

The phrases "real-world" and "[b]ased on what we can discern from experience" provide a window into the nature of this step in the analysis. The government cannot meet its burden at either step by asserting mere conjecture. But the Court in *McCutcheon* demonstrated a strong interest in linking, at this second step, the law under review to the practical circumstances it is designed to impact. For that reason, we are assessing "fit" here by taking a much closer look at Section 1513 in the context of the "real world" that it addresses.

The Court noted in *Randall* that "[a]s compared with . . . contribution limits upheld by the Court in the past, and with those in force in other States, [the Act's political contribution] limits are sufficiently low as to generate suspicion that they are not closely drawn."[52] Notably, the breadth of the prohibition imposed here goes far beyond that considered in *Randall.* Section 1513 imposes a flat ban on all types of contributions, no matter how small. It forbids any form of contribution, not just money, but also contracts, loans, or "any valuable thing."[53] And it has no de minimis threshold for contribution amount. Unlike in *Buckley*, contributors in the Commonwealth cannot make even symbolic expressions of support "through a small contribution" under Section 1513.[54] Moreover, the ban applies to all beneficiaries of a trust that holds "any beneficial interest" in a gaming licensee.[55] As the District Court noted "a contribution of a single dollar from the beneficiary of a trust that owns a minority stake in a holding company that, in turn, owns a gaming licensee" is prevented under Section 1513. The

---

[52] *Id*.

[53] 4 Cons. Stat § 1513(a).

[54] *Buckley*, 424 U.S. at 24.

[55] 4 Pa. Cons. Stat §1325(d)(1).

20

same is true for banks that underwrite licensees and out-of-state gaming licensees.[56]   Finally, the ban applies to all politicians, public officials, and political organizations in the Commonwealth.

Such a far-reaching restriction may prevent political contributions from being a source of quid-pro-quo corruption. And we respect all legislative determinations on measures to address this critical problem.  But the burden these restrictions impose on First Amendment rights demands that we have some way to "exercise . . . independent judicial judgment" to determine whether Section 1513 is closely drawn to be a proportional response. [57]

The record the Commonwealth created directs us to the corruption memorialized in two cases from New Jersey and Louisiana to understand the "real world" that Section 1513 addresses.[58]  The record in these cases, the Commonwealth's logic goes, will inexorably lead us to the same conclusions that those courts reached:  that it is "necessary to distance gaming

---

[56] 4 Pa. Cons. Stat. §§ 1103, 1513(a)(5) and (6).

[57] *Randall*, 548 U.S. at 249.

[58] *Petition of Soto*, 565 A.2d 1088. 1093 (N.J. Super. App. Div. 1989); *Ass'n of Louisiana v. State ex rel. Foste*r, 820 So.2d 494 (LA. 2002).  One indication that the history in New Jersey factored into the enactment of Section 1513 is that State Representative Schroder read a portion of the *DePaul* opinion (quoted above), which quoted *Petition of Soto*, into the legislative record as lawmakers debated the amendment to the Gaming Act in 2009.  Pennsylvania House Journals, 2009 Reg. Sess. No. 103 (10/5/2009) at 2102-03 (quoting *DePaul v. Com.*, 969 A.2d at 545 and *Petition of Soto*, 565 A.2d at 1093).

21

interests from the ability to contribute to candidates and political committees which support candidates,"[59] and that "there is no viable alternative [to restricting all political contributions] to prevent the appearance of, or actual, corruption of the political process."[60] The Commonwealth contends this is the inevitable upshot because gaming-industry-related "pay for play" is a function of "human nature,"[61] making the necessity of prohibiting even *de minimis* contributions "common sense."[62]

There are a couple of problems with this. The Commonwealth presumes that the records developed in *Petition of Soto* and *State ex rel. Foster* support a judgment that a total prohibition of political contributions is a proportional response. But even if they could support it, other states with legalized gaming similar to Pennsylvania—beyond New Jersey and Louisiana—have taken a much different approach. The Commonwealth never addresses this.

At present, a total of twenty-five states (including Pennsylvania) have some form of legalized commercial, non-tribal casino gambling (including so-called "racinos" and riverboats).[63] The District Court found in its own review, as

---

[59] *State ex rel. Foster*, 820 So. 2d at 508.

[60] *Petition of Soto*, 565 A.2d at 1098.

[61] Reply Brief p. 6.

[62] Reply Brief p. 12.

[63] *See* Arkansas (AR. Const. Amend. 100, §§ 1 to 11; Ark. Code §§ 23-113-101 to 113-604); Colorado (Colo. Rev. Stat. §§ 44-30-101 to 836); Delaware (Del. Code tit. 29, §§ 4801 to 4838); Florida (Fla. Stat. §§ 849.01 to .46); Illinois (230 Ill. Comp. Stat. Ann. 40/1 to 40/85); Indiana (Ind. Code Ann. § 4-

the Pennsylvania Supreme Court did eight years earlier, that bans with the scope and breadth of Section 1513 are not common among these states.[64]  We have reached the same conclusion.  In fact, the overwhelming majority of states with commercial, non-tribal casino gambling like Pennsylvania do not have any political contribution restrictions that apply specifically to gaming industry-related parties.[65]  In these

---

33-10-2.1); Iowa (Iowa Code Ann. § 99F.6); Kansas (Kan. Stat. Ann. §§ 74-8701 to 8780); Louisiana (La. Stat. §§ 27:1 to :502); Maine (Me. Rev. Stat. tit. 8, §§ 1001 to 1072); Maryland (Md. State Gov't Code. § 9-1A-01 to 38); Massachusetts (Mass. Gen. Laws ch. 23K, §§ to 71; 205 Code Mass. Regs. 108.01); Michigan (Mich. Comp. Laws §§ 432.1 to 516; Mich. Comp. Laws § 432.207b (Repealed by P.A.2019, No. 158, § 1, Imd. Eff. Dec. 20, 2019));Mississippi (Miss. Code §§ 75-76-1 to 325); Missouri (Mo. Rev. Stat. Ann. §§ 313.004 to 313.850); Nevada (Nev. Rev. Stat. Ann. §§ 462 to 467); New Jersey (N.J. Stat. Ann. § 5:12-138); New Mexico (N.M. Stat. Ann. §§ 60-2E-1 to 60-2E-62); New York (N.Y. Rac. Pari-Mut. Wag. & Breed. Law §§ 100 to 1410 (McKinney)); Ohio (Ohio Rev. Code §§ 3772.01 to 3772.99); Oklahoma (Okla. Stat. Ann. tit. 3A, §§ 200 to 20); Pennsylvania, (4 Pa. Cons. Stat. §§ 1101 to 1904, § 1513); Rhode Island (42 R.I. Gen. Laws Ann. §§ 42-61-1 to 17); South Dakota (S.D. Codified Laws §§ 42-7B-1 to 42-7B-75); West Virginia (W. Va. Code Ann. §§ 29-22A-1 to 22E).

[64] *Deon,* 341 F. Supp. 3d at 445 n. 2.

[65] These states do have laws applying to the general population that prohibit political contributions over a particular threshold. In our own review we found that, of the twenty-five states with legalized casino gambling (including racinos and riverboats), nineteen do not impose any special restrictions on the political

contributions of gaming industry-related parties. Instead, they have generally applicable political contributions limits. *See* Alabama (Ala. Code § 17-5-1 to 21 ); Colorado, (Colo. Const. Art. XXVIII; 8 Colo. Code Regs. § 1505-6); Delaware (Del. Code Ann. tit. 15, §§ 8001, 8010 and 8012); Florida (Fla. Stat. §§ 106.011 and 106.08); Illinois (10 Ill. Comp. Stat. 5/9-8.5); Kansas (Kan. Stat. Ann. §§ 25- 4143 and 25-4153); Maine (Me. Rev. Stat. tit. 21-A, § 1015); Maryland (Md. Code Ann., Elec. Law §§ 13-226 and 13-227); Michigan (Mich. Comp. Laws §§ 169.241, 169.252 and 169.254); Mississippi (Miss. Code Ann. §§ 23-15-1021 and 97-13-15); Missouri (Mo. Rev. Stat. § 130.029 and 130.031); Nevada (Nev. Const. art. 2 § 10; Nev. Rev. Stat. § 294A.100); New Mexico (N.M. Stat. Ann. § 1-19-34); New York (N.Y. Elec. Law § 14-114); Ohio (Ohio Rev. Code Ann. §§ 3517.102, 3517.104 and 3599.03); Oklahoma (Okla. St. Ethics Commission, Rule 2.17) Rhode Island (R.I. Gen. Laws §§ 17-25-10.1 and 17-25-12); South Dakota (S.D. Codified Laws §§ 12-27-7 and 12-27-8); West Virginia (W. Va. Code §§ 3-8-5c, 3-8-8 – 3-8-12). The remaining six states (Indiana, Iowa, Louisiana, Massachusetts, New Jersey and Pennsylvania) impose political contribution bans on gaming industry-related parties. But just three of these states (Louisiana, Massachusetts and New Jersey) have implemented a ban of comparable scope to Pennsylvania. Iowa restricts "qualified sponsoring" organizations from making contributions, (Iowa Code Ann. § 99F.6). Indiana imposes a ban on a "licensee or a person with an interest in a licensee" from contributing to "a member of a precinct committee" to induce the member of the precinct committee to do any act or refrain from doing any act with respect to the approval of a local public question under IC 4-33-6-19 or IC 4-

nineteen states, even accounting for political contribution laws that apply to their entire populations,[66] none ban all political contributions by such parties. This fatally undermines the Commonwealth's central premise that the nature of gaming-industry-related corruption creates a "common sense" need to adopt measures of the breadth of Section 1513. This is the result because, even if we assume arguendo that findings like those in *Petition of Soto* and/or *State ex rel. Foster* could support a judgment that Section 1513 is closely drawn, the Commonwealth would need to show far more than it has done here to meet its burden.

These nineteen states, combined with the Commonwealth, create a tautology: all things being equal, allowing some political contribution (even a symbolic *de minimis* one) is less burdensome on First Amendment rights than allowing no political contribution at all. And although the Commonwealth need not adopt the least restrictive means to address gaming-related corruption, it must prove that it has created a proportional, closely drawn scheme to address the issue.

Perhaps the Commonwealth is accurately asserting that, like New Jersey and Louisiana, the presence of the gaming industry within its borders creates the need for a law with the breadth of Section 1513. But the inescapable fact here is that the experience of nineteen other states with commercial, non-tribal casinos has not generated a similar legislative judgment. And because these schemes place less of a burden on First

---

33-6-19.3." Ind. Code Ann. § 4-33-10-2.5. These bans are more limited in scope.

[66] *Id.*

Amendment rights, the Commonwealth—at a minimum—had the burden of showing why the experiences of New Jersey and Louisiana provide a better basis to assess the proportionality of Section 1513 than one of these other states. It relies on the histories and legislative judgments of two states with similar laws to make its case here. But it does so without reference to states that have taken different approaches less burdensome to First Amendment rights.

The Commonwealth's implicit appeal to "common sense" as a surrogate for evidence in support of its far-reaching regulatory scheme is noteworthy in this evidence-based inquiry, particularly in light of the approach taken by most other similarly situated states. Our assessment of fit is meaningless unless we can be sure that it is fixed to a reasonable understanding of the real world that Pennsylvania faces. Ultimately, this dearth of evidence is why the Commonwealth falls well short of its burden to show that Section 1513 is closely drawn. Like the District Court, we do not conclude that it is impossible for the Commonwealth to defend the proportionality of its law. We only conclude that it has failed to give us enough information to assess it here. This failure is dispositive.[67]

D.

For all of these reasons we conclude that the Commonwealth has not met its burden of proving that Section

---

[67] Deon and Hardy also claim that Section 1513 unconstitutionally bans contributions to independent expenditure groups. As we conclude that the law is unconstitutional on other grounds, we do not reach this issue.

1513 is a closely drawn, proportional response consistent with an important anti-corruption interest.  Accordingly, we will affirm the order of the District Court.